MODERNAGE DEVELOPERS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Modernage Developers v. Commissioner
Docket No. 26308-91
United States Tax Court
T.C. Memo 1993-591; 1993 Tax Ct. Memo LEXIS 607; 66 T.C.M. (CCH) 1575; December 15, 1993, Filed *607 Decision will be entered under Rule 155. P was a closely held corporation engaged in residential development in New England. R disallowed as unreasonable a portion of the sec. 162, I.R.C., deduction for compensation claimed by P with respect to amounts paid to its two shareholder-officers. Held: R's determination that a portion of the payments made by P to its two shareholder-officers during its 1988 and 1989 taxable years did not constitute reasonable compensation is sustained. For petitioner: Howard I. Rosen. For respondent: Robert E. Marum. HALPERN
HALPERN
MEMORANDUM FINDINGS OF FACT AND OPINION HALPERN, Judge: By notice of deficiency dated August 23, 1991, respondent determined deficiencies and additions to tax against Modernage as follows: Tax Year Ending
Addition to Tax
June 30
Deficiency
Sec. 6651(a) 1988
$  32,847
--  1989
729,892
$ 36,495
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Certain issues having been conceded, the only issue for decision is the reasonableness of compensation paid *608 by petitioner Modernage Developers, Inc. (Modernage), to two of its employees, Rejean and Yvon Carrier (Rejean and Yvon), during the years in issue. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts filed by the parties and attached exhibits are incorporated herein by this reference. Background of the Carrier Brothers
Rejean and Yvon, brothers, came to the United States from Canada when they were in their late teens or early twenties. They have little formal education; Rejean attended school through the ninth grade, while Yvon completed the fifth grade. The two brothers' mother tongue is French, and they did not learn English until they arrived in the United States. Initially, they worked in the home framing business; in 1973, they went into business for themselves, organizing Modernage (a Connecticut corporation). Over the years, the brothers have organized many other corporations, one to construct single-family houses, others to hold land, and still others to assist with financing. Formation and Operation of Modernage
At the time the petition in the instant case was filed, Modernage's principal place of business *609 was in Southington, Connecticut. Modernage computes its income on the basis of a fiscal year ending on June 30. For its 1980 through 1989 taxable years, Modernage was the common parent corporation of an affiliated group of corporations (the group) making a consolidated return of income. At various times during that period, the following were among members of the group: (1) CAC Development, Inc., (2) R & C Construction, Inc., and (3) Carrier Enterprises, Inc. During the years in issue, the group was engaged in various aspects of the home construction business. The group's activities included acquiring land, obtaining the necessary government approvals for development, improving acquired land by constructing residential units thereon, marketing the finished units, and financing purchases thereof. Rejean's and Yvon's Relationship to Modernage
From the incorporation of Modernage in 1973 until September 23, 1988, Rejean and Yvon were the equal, sole owners of Modernage. From July 1, 1979, through September 23, 1988, they were its only directors and officers. Yvon's stock in Modernage was redeemed on September 23, 1988; thereafter, Rejean remained as its sole shareholder. *610 The brothers performed a variety of duties in the business of the group, which, in many other businesses, would have been undertaken by several additional individuals. The brothers' typical weekday began at 5:30 a.m., when they met with their work crews. They would then spend most of the remainder of the day at various job sites. In the afternoon, the brothers would return to their office to review paperwork and perform other administrative functions. They would also meet with bankers, lawyers, and engineers, and attend government hearings. A typical workday for the brothers would end at 6:30 p.m. In addition, they would meet with potential buyers of their residential units in the evenings and on weekends. For the most part, the brothers did not keep formal business records of their substantive decisions with respect to Modernage, since they trusted each other and saw little need for such records. The brothers viewed Modernage and its subsidiaries as a single business organization, and did not differentiate many of their activities as being on behalf of one member of the group or another. Modernage's Financial Status
During the years in issue, the group constructed *611 homes of about 1,200 to 1,500 square feet, selling for between $ 180,000 and $ 225,000. The brothers sold about 25-30 homes each year. The gross receipts derived from home sales were in excess of $ 2 million for 1988 and $ 5 million for 1989. During the years in issue, the group employed between 25 and 30 employees. Consolidated returns filed by the group for Modernage's 1981 through 1989 taxable years report consolidated income as follows: Table 1 Taxable year
Ending June 30
Gross Income
Taxable Income
1989
$ 4,122,974
($ 159,258)
1988
3,952,756
(98,372)
1987
3,272,077
184,833 1986
3,576,420
242,651 1985
1,729,877
100,333 1984
1,331,312
104,258 1983
1,350,715
40,036 1982
709,657
(129,344)
1981
632,347
91,006 Members of the group borrowed money to finance ventures of the group. The brothers stood as guarantors for those liabilities. The sum of liabilities guaranteed by the brothers peaked in 1988 at over $ 20 million. From its incorporation through the years in issue, Modernage declared no dividends. Compensation
The brothers are each calendar year taxpayers. From 1980 through 1989, on their Federal income tax returns, the *612 brothers each reported three categories of compensation for their services to the group. They reported commissions, management fees, and salaries. Both the commissions and the management fees were paid by members of the group to the brothers, although it is unknown which member made any particular payment. For 1980 through 1985, the brothers reported salary payments received from CAC Development, Inc. [1] For 1986 through 1988, the brothers reported salary payments received from Modernage. [2] For 1989, Rejean reported salary payments received from Modernage and R & C Construction, Inc., and Yvon reported salary payments received from Modernage. [3] The following table shows such compensation: Table 2
Rejean Yvon Comms. &
Comms. &
Year
Mgmt. Fees
Salary
Total Mgmt. Fees
Salary
Total 1980
$ 71,500
$   86,700
$   158,200
$ 71,500
$   86,000
$   157,500
1981
94,250
78,000
172,250
94,250
78,000
172,250
1982
0
51,700
51,700
0
44,000
44,000
1983
10,000
66,000
76,000
10,000
43,000
53,000
1984
28,750
52,000
80,750
28,750
52,000
80,750
1985
73,036
78,000
151,036
70,987
78,000
148,987
1986
74,979
679,000
753,979
74,605
679,000
753,605
1987
60,000
713,000
773,000
60,000
641,000
701,000
1988
40,000
1,150,000
1,190,000
40,000
1,189,194
1,229,194
1989
2,250
2,622,000
2,624,250
2,250
150,000
152,250
*613 For its fiscal years ending June 30, 1988 and 1989, the group paid salaries to the brothers as follows: [4]
Table 3
Year
Rejean Yvon Total
1988
$ 1,060,000
$ 1,095,775
$ 2,155,775
1989
2,732,000
150,000
2,882,000
*614 Modernage claimed deductions on its 1988 and 1989 returns for amounts less than the salaries it paid to the brothers. That is because it treated a portion of such payments as capital expenditures, for which a deduction in full was not immediately claimed. Respondent has made adjustments to the amounts capitalized for each year. Modernage has conceded the correctness of those adjustments. Taking into account those adjustments, the amounts paid, capitalized, and deducted as salaries paid to Rejean and Yvon for each of Modernage's taxable years in issue are as follows: Table 4
Rejean Yvon Year
Capitalized
Deducted
Total Capitalized
Deducted
Total 1988
$ 215,578
$   844,422
$ 1,060,000
$ 215,578
$ 880,197
$ 1,095,775
1989
77,460
2,654,540
2,732,000
--
150,000
150,000
The corporate minutes book of Modernage for the years in issue contains no minutes relating to the compensation to be afforded its officers. ULTIMATE FINDINGS OF FACT Reasonable allowances for current year services rendered by Rejean and Yvon to the group for Modernage's taxable years 1988 and 1989 do not exceed the following: Year
Rejean Yvon 1988
$ 558,000
$ 558,000
1989
519,000
119,441
*615 Deductions claimed by Modernage for its 1988 and 1989 taxable years for salaries paid to Rejean and Yvon exceeded reasonable allowances for services actually rendered by them by the amounts of $ 403,005 for 1988 and $ 1,968,856 for 1989. OPINION This case requires that we determine the reasonableness of salaries paid Rejean and Yvon Carrier for services rendered to corporations owned directly or indirectly by them. To the extent we find such salaries to exceed a reasonable allowance for personal services actually rendered to such corporations, we must sustain respondent's disallowance of deductions. See sec. 162(a). [5] The taxable years in question are Modernage's 1988 and 1989 fiscal years ending on June 30. The salaries in question, and their tax treatment, both by Modernage and respondent, are as follows: Table 5 1988
Rejean
Yvon
Petitioner Respondent Petitioner Respondent Capitalized
$   215,578
$   215,578
$   215,578
$   215,578
Deducted
844,422
880,197
Allowed
660,807
660,807
Unreasonable
183,615
219,390
Total
$ 1,060,000
$ 1,060,000
$ 1,095,775
$ 1,095,775
1989
Rejean
Yvon
Petitioner Respondent Petitioner Respondent Capitalized
$   77,460
$   77,460
Deducted
2,654,540
$ 150,000
Allowed
708,184
$ 127,500
Unreasonable
1,946,356
22,500
Total
$ 2,732,000
$ 2,732,000
$ 150,000
$ 150,000
*616 Reasonable Compensation: A Question of Facts and Circumstances
The question of whether compensation is reasonable is to be resolved upon a consideration of all of the facts and circumstances of the case. E.g., Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1155 (1980). Modernage bears the burden of proving reasonableness. Rule 142(a); Home Interiors & Gifts, Inc. v. Commissioner, supra.The factors considered relevant in determining reasonableness of compensation include: (1) The employee's qualifications, (2) the nature, extent and scope of the employee's work, (3) *617 the size and complexities of the business, (4) a comparison of salaries paid with the gross income and the net income of the payor, (5) the prevailing general economic conditions, (6) comparison of salaries with distributions to stockholders, (7) the prevailing rates of compensation for comparable positions in comparable concerns, (8) the salary policy of the taxpayer as to all employees, and (9) in the case of small corporations with a limited number of officers, the amount of compensation paid to a particular employee in previous years. Home Interiors & Gifts, Inc. v. Commissioner, supra; Nelson Bros., Inc. v. Commissioner, T.C. Memo. 1992-726. Where shareholder-officers who are in control of a corporation set their own compensation, careful scrutiny is required to determine whether the alleged compensation is in fact a distribution of profits. Home Interiors & Gifts, Inc. v. Commissioner, supra at 1156. Focus on Prior Years
As will be made clear, our concentration here is on the ninth factor listed above: the amount of compensation paid in prior years. [6] At trial, Modernage *618 presented two expert reports in support of its contention that it was deducting no more than a reasonable allowance for salaries paid to Rejean and Yvon. One expert report was prepared by the firm of Deloitte and Touche (the Deloitte and Touche report) and includes tables showing the market value of the services rendered by the brothers to the group for each year from 1980 through 1989. Such market values constitute the current year component of the total compensation package that, for each year in question, Deloitte and Touche opines is reasonable. Such current year amounts are as follows: Table 6
Year
Rejean
Yvon
1980
$ 295,000
$ 295,000
1981
341,000
341,000
1982
399,000
399,000
1983
450,000
450,000
1984
496,000
496,000
1985
533,000
533,000
1986
552,000
552,000
1987
588,000
588,000
1988
558,000
558,000
1989
519,000
[1] 519,000
As shown by table 5, above, for both of the years *619 in issue (1988 and 1989), respondent allowed deductions in excess of Deloitte and Touche's determinations of the current year components for such years. We do not understand Modernage to be arguing that any amounts in excess of the amounts set forth in table 6 for 1988 and 1989 would be reasonable compensation for current year services rendered to the group for those years. In any event, we have found that reasonable allowances for current year services rendered by Rejean and Yvon to the group for Modernage's taxable years 1988 and 1989 do not exceed the amounts for such years set forth in table 6. That finding, however, does not end our inquiry, since the focus of Modernage's argument is that the allowances for salaries paid during the years in question were reasonable because Rejean and Yvon were undercompensated in prior years (i.e., that reasonable compensation for each year in question properly included not only a current year component but also a prior year component). *620 Compensating for Past Services
It is well established that a corporation may deduct as reasonable compensation payments made to an employee for both current and undercompensated past services. Lucas v. Ox Fibre Brush Co., 281 U.S. 115 (1930). As a general rule, in order for a corporation to be entitled to a deduction for compensation payments made to an employee for undercompensated past services, it must establish (1) the amount of undercompensation, American Foundry v. Commissioner, 59 T.C. 231, 239 (1972), affd. on this issue and revd. on other issues 536 F.2d 289 (9th Cir. 1976), and (2) that current payments were intended as compensation for past services, Perlmutter v. Commissioner, 44 T.C. 382, 403 (1965), affd. 373 F.2d 45 (10th Cir. 1967); see also Bickes-Wilbert Burial Vault Co. v. Commissioner, T.C. Memo. 1986-172; R.J. Kremer Co. v. Commissioner, T.C. Memo. 1980-69. We find that Modernage has established neither the amount of past undercompensation *621 nor that the current payments were intended to rectify past undercompensation. Failure To Establish Fact of Undercompensation
With regard to the first factor -- the amount of undercompensation -- Rejean did testify that he should have been paid "half a million dollars and above" for each year, beginning in 1980. He testified that his brother was in the same position. His brother agreed. We do not find that testimony persuasive. Clearly, however, Modernage does not rely primarily on that testimony to establish the amount of undercompensation of Rejean and Yvon for 1980 through 1987. To establish that, Modernage relies primarily on the expert opinion of Deloitte and Touche. As set forth above (table 6), Deloitte and Touche has an opinion as to the market value of the services rendered by the brothers to the group for each year from 1980 through 1989. The basis of that opinion is set forth in the Deloitte and Touche report. That basis was additionally explained by Jeffrey N. Perrone, a partner of that firm, who signed the Deloitte and Touche report on behalf of the firm. It is clear from both Mr. Perrone's testimony and the Deloitte and Touche report itself that, *622 in forming its opinion as to the market value of the brothers' services for each of the years dealt with in the report, Deloitte and Touche directly established the appropriate amount of base compensation for 1 out of the 10 years in question (viz, 1988; see transcript, pp. 176, 177). Deloitte and Touche then extrapolated to each of the other years, adjusting base compensation solely to take into account inflation (at a constant rate of 5 percent). [7] See transcript, p. 177; Deloitte and Touche report, exhibits 3 and 4, NN.1. Indeed, it is clear from Mr. Perrone's testimony that Deloitte and Touche believed the 1988 level of compensation (adjusted for inflation) to be the appropriate level for all of the years addressed by the report. See transcript, pp. 177, 178. Simply put, we cannot agree with that assumption, given (1) certain other aspects of Deloitte and Touche's opinion and (2) the second expert opinion presented to us by Modernage: that of David Schwartzman and Edward Nell (the Schwartzman and Nell report). *623 The Ups and Downs of the Business Cycle
Both the Deloitte and Touche report and the Schwartzman and Nell report present Modernage as facing a business cycle from 1980 through 1989 that was at a low point in the beginning and at a high point at the end. "The early years [of that cycle] represent a dormant period characterized by high interest rates and a slow economy." Deloitte and Touche report 8. The Schwartzman and Nell report characterizes the cycle in stronger, more graphic terms: [T]he early years of the 1980s were difficult years, in which business was poor * * * * * * In the early 1980s residential construction was in a deep slump, and in Connecticut and the Northeast, had been in a weakened state for almost a decade. * * * The upswing was long and slow; it began in 1982 and even two years later it had only reached the level of 1978. It was not until 1985 that the level of 1972 was reached. By 1986 and 87, however, the cycle had reached a peak, and a downturn was just around the corner, although it would be two more years before the actual downswing in spending. * * *
Schwartzman and Nell report 2,9. Parity Not Established
Considering the *624 business cycle described by the experts, what we cannot accept of Deloitte and Touche's opinion is the parity between base compensation for (1) 1988 (admittedly an excellent year for petitioner's business) and (2) the earlier years of the cycle (a "dormant period"; "residential construction * * * in a deep slump"). Indeed, in discussing general trends in executive compensation, the Deloitte and Touche report states that total annual compensation (and, in particular, the short-term component thereof) is determined in direct response to, among other things, "ability to pay". Deloitte and Touche report 6-7. Clearly, Modernage's ability to pay was considerably weaker during the early eighties (the down part of the business cycle) than it was during the late eighties (the up part of the business cycle). Nevertheless, the Deloitte and Touche report is not sensitive to changes in Modernage's ability to pay. Yes, inflation is taken into consideration; nevertheless, Deloitte and Touche have not argued (nor would we necessarily accept) that the constant adjustment for inflation (5 percent a year) is an adequate substitute for the effects of the business cycle described by them and Schwartzman *625 and Nell on Modernage's ability to pay. Deloitte and Touche have not otherwise taken account of Modernage's ability to pay. Thus, the report does not adequately explain why the brothers' base pay in the early eighties would have been the same (but for inflation) as it should have been in the late eighties. While we do not reject the premise in each expert's report that an executive's compensation in years of fat may be set with an eye to his past service during years of lean, we are unconvinced here by Deloitte and Touche as to what the brothers should have earned during the years of lean (in the early eighties). The particular business conditions faced by Modernage during any particular year (other than 1988, the base year) appear to play no role whatsoever (except as expressed in the constant adjustment for inflation and by the level of required loan guarantees) in Deloitte and Touche's hypothesis as to what Modernage should have paid the brothers for that year. We thus accord little weight to Deloitte and Touche's opinion as to the amount of the brothers' compensation paid during Modernage's 1988 and 1989 years that represented compensation for past services. Failure *626 To Establish Intent To Make Up for Undercompensation
Even granting some prior undercompensation, we are also unconvinced that Modernage intended some component of the compensation paid the brothers in 1988 and 1989 to make up therefor. First, corporate records contemporaneous to 1988 and 1989 contain no indication of such intent. Second, even in retrospect, Modernage's agent, Rejean, was unable to testify with any exactitude how (if at all) his and his brother's compensation for 1988 and 1989 was divided up between past and present compensation: Q How did you arrive at the compensation figure * * * for 1989 * * * A Okay. By looking, without going to the specific of it, in detail which it's 1989, what I was getting in 1980, '81 and all those years, you know, that I was unable to pay myself what I felt I was underpaid, basically. That's how I arrived at that figure and now the money was available, you know, for the corporation to be able to do that.
Simply put, Modernage has not carried its burden of showing that any portion of the brothers' compensation paid in 1988 or 1989 constituted compensation for past services. Findings and Holding
Finally, *627 respondent has allowed for each year in issue a deduction for compensation in excess of what Modernage's expert, Deloitte and Touche, opined was appropriate market compensation for the brothers for that year (the current year component). (See table 5). Such excesses may well represent respondent's concession that the brothers deserved, and were paid, some compensation for past services (a prior year component). We are not convinced that any allowances in excess of the amounts allowed were reasonable, and we have found that they were not. We hold that deductions claimed by Modernage for 1988 and 1989 for salaries paid to the brothers exceeded reasonable allowances for services actually rendered by them by the amounts of $ 403,005 and $ 1,968,856, respectively, and that such amounts, therefore, are not deductible under section 162(a)(1). Decision will be entered under Rule 155. Footnotes
1. CAC Development, Inc., did not file as part of the affiliated group for Modernage Developers, Inc.'s (Modernage's) 1980 and 1981 tax years.↩
2. In 1988, Yvon reported $ 1,189,194 of salary income. His Form W-2 from Modernage for that year, however, reflects only $ 1,185,774. Nothing in the record explains that disparity.↩
3. Yvon also reported $ 1,004,315 of income from Carrier Enterprises, Inc. Since that corporation was not a part of the affiliated group, however, we do not consider that income in our analysis.↩
4. All salaries during those years were paid to the brothers by Modernage, save in 1989, when $ 2,582,000 of Rejean's salary was paid by R & C Construction, Inc., a subsidiary of Modernage.↩
5. In pertinent part, sec. 162(a) provides: (a) In General. -- There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including -- (1) a reasonable allowance↩ for salaries or other compensation for personal services actually rendered; [Emphasis added.]
6. Because of the way this case has been presented, we need not rely heavily on the remaining factors. We note, however, that during its entire history, up to and including the years in issue, petitioner neither declared nor paid any dividends. "The absence of any dividends raises the inference that some of the compensation was a distribution of profits, rather than payments purely for services." R.J. Kremer Co., v. Commissioner, T.C. Memo. 1980-69↩.
1. Yvon actually worked for the group for only 84 days during its 1989 taxable year. Accordingly, the market value of his services to the group for that year, if prorated on the basis of the days worked, would be $ 119,441 (84/365 x $ 519,000 = $ 119,441).↩
7. For each year, to reach market compensation, base compensation is increased (1) by a 50-percent bonus and (2) on account of certain qualifying factors. Except for a qualifying factor to take account of loan guarantees by the particular brother, the qualifying factors increase base compensation by a constant percentage for each year. E.g., the following table, exhibit 3 to the Deloitte and Touche report, calculates adjusted market compensation for Rejean. REJEAN
($ IN 000S) Actual
Adjusted Market
Marketplace Conditions
Qualifiers
Adjusted
Year
Total
Base (1)
50% Bonus
Total
A
B
C
D
Total
1980
$   87
$ 141
$  71
$ 212
15%
10%
5%
$  20
$ 295
1981
78
148
74
222
15%
10%
5%
52
341
1982
52
156
78
233
15%
10%
5%
96
399
1983
66
163
82
245
15%
10%
5%
131
450
1984
52
172 86
257
15%
10%
5%
161
496
1985
78
180
90
270
15%
10%
5%
182
533
1986
679
189
95
284
15%
10%
5%
183
552
1987
713
199
99
298
15%
10%
5%
201
588
1988
1,000
209
104
313
15%
10%
5%
151
558
1989
2,605
219
110
329
15%
10%
5%
92
519
(1) Assumes annual escalation of 5%. (A) Job responsibility adjustment with Modern Age Developers due to: - Varying levels of responsibility - Job title activities performed equivalent to a full-time equivalent not otherwise hired (B) Job responsibility in managing apartments. (C) Location indices for the Northeastern United States. (D) Loan guarantee fee typically used as additional compensation (risk - reward). based upon % of liabilities guaranteed.↩